**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**

| | |
|---|---|
| PAULA SUTTON , | DOCKET NUMBER |
| Appellant, | CB-7121-24-0003-V-1 |
| v. | |
| DEPARTMENT OF HOMELAND SECURITY , | DATE: November 25, 2024 |
| Agency. | |

# THIS ORDER IS NONPRECEDENTIAL[1]

Sameera Mangena, Oakland, California, for the appellant.

Eli Kirschner and Joey Ann Lonjers, Long Beach, California, for the agency.

**BEFORE**

Cathy A. Harris, Chairman
Raymond A. Limon, Vice Chairman
Henry J. Kerner, Member

**ORDER**

¶1    The appellant has filed a request for review of an arbitration decision that sustained the agency's decision to remove her for unacceptable performance under 5 U.S.C. chapter 43. For the reasons set forth below, we GRANT the

---

[1] A nonprecedential order is one that the Board has determined does not add significantly to the body of MSPB case law. Parties may cite nonprecedential orders, but such orders have no precedential value; the Board and administrative judges are not required to follow or distinguish them in any future decisions. In contrast, a precedential decision issued as an Opinion and Order has been identified by the Board as significantly contributing to the Board's case law. *See* 5 C.F.R. § 1201.117(c).

request for review under 5 U.S.C. § 7121(d), REVERSE the arbitrator's finding that the agency proved its charge of unacceptable performance and ORDER the agency to cancel the appellant's removal, VACATE the arbitrator's finding that the appellant did not prove her affirmative defense of reprisal for the Rehabilitation Act-protected activities of requesting reasonable accommodations and filing equal employment opportunity (EEO) complaints opposing disability discrimination, and FORWARD the matter to the Western Regional Office for further adjudication of this affirmative defense. The appellant's removal is NOT SUSTAINED.

## BACKGROUND

¶2        Prior to the appellant's removal, the appellant worked as a GS-13 Environmental Protection Specialist for Customs and Border Protection in Laguna Nigel, California. Request for Review File (RFR File), Tab 1 at 14. According to the appellant, beginning in 2017, her "primary responsibility" became completing environmental fact sheets regarding the land ports of entry in the United States. *Id*. at 19. The final version of the fact sheets were uploaded into a database called "TRIRIGA" and available to the public. *Id*. Initially, her performance goal was to complete six fact sheets per pay period; however, her then-supervisor lowered that goal to four fact sheets per pay period, which she did not always complete. *Id*. at 438.

¶3        Beginning in September 2020, the appellant, who has a hearing impairment, inquired about the agency's COVID-19 safety measures and if clear face masks would be available to facilitate lipreading for hearing-impaired individuals. RFR File, Tab 2 at 3. In October 2020, H.M. became the appellant's first-level supervisor. RFR File, Tab 1 at 439. On February 10, 2021, H.M. and S.E., the Chief of Field Support and Mobile Work in the agency's Laguna Nigel office, were copied on emails concerning the appellant's face mask inquiries. RFR File, Tab 2 at 9-14. In response, S.E. emailed the appellant stating that they would

provide information "when time permit[ted]" and to "please allow [the] team to return to their time-sensitive work." *Id*. at 11-12. H.M. also responded, ordering the appellant "to immediately stand down [her] communications with [S.E.] and his team" and stating that her inquiries were "highly unprofessional." *Id*. at 9-10. On March 3, 2021, H.M. issued the appellant a counseling memorandum concerning 31 past-due fact sheets from November 2020 and reiterated the expectation that the appellant complete four fact sheets per pay period. RFR File, Tab 5 at 319-22. On March 26, 2021, the appellant initiated contact with an agency equal employment opportunity (EEO) counselor concerning the face mask issue, alleging disability discrimination and reprisal, and that the agency failed to accommodate her. RFR File, Tab 2 at 2.

¶4      On July 15, 2021, H.M. issued the appellant a 60-day employment proficiency plan (EPP), which placed the appellant under a performance improvement period (PIP) based on unacceptable performance, citing the appellant's continued failure to produce the required four fact sheets per pay period. RFR File, Tab 2 at 324-27. The letter provided that, during the EPP period, the appellant was required to produce two fact sheets per pay period. *Id*. at 325. It also outlined the information that was to be included in the fact sheets and set deadlines for submission. *Id*. at 325-26. On November 18, 2021, H.M. notified the appellant that she met the requirements of the EPP. *Id*. at 329. She further advised the appellant that she must maintain her performance for the following 12-month period, beginning July 15, 2021. *Id*.

¶5      In September 2021, the appellant asked her team leader if she could indicate on the agency's SharePoint site that her preferred method of communication was email and video because of her hearing impairment. RFR File, Tab 1 at 386-87. On December 7, 2021, the team leader told the appellant to delete her telephone number in SharePoint so that email was the only communication option. *Id*. at 385. That day, the appellant complained to several management officials,

including H.M., that she believed she was being "marginalized" and that the team leader's response to her accommodation request was insufficient. *Id*. at 384-85.

¶6 On December 8, 2021, H.M. made the appellant's requested change in SharePoint and emailed the appellant that she should have come directly to H.M. to handle her request at "the lowest level" and to "avoid unnecessary conflict." *Id*. at 384. She concluded that "the below correspondence is an example of miscommunication that could have been more easily rectified by simply . . . speaking directly with the person involved." *Id*. at 384-85. The appellant then replied that she submitted her request to the team lead because she was the point of contact listed on the SharePoint site. *Id*. at 383. In response, H.M. emailed a labor relations representative requesting advice on how to respond to the appellant who "sees the need to respond the way she did and include the majority of [H.M.'s] [Program Management Office (PMO)] leadership for no clear reason." *Id*. H.M. also stated that she was "at [her] limits" with the appellant's "irrational accusations" and felt "under attack." *Id*. She continued that she felt their "professional relationship and level of respect for each other" had improved during the appellant's EPP period, but "the below is evidence that [she was] incorrect in [her] beliefs and [she had] run out of ideas on how to effectively manage this employee's behavior." *Id*.

¶7 On March 15, 2022, the agency proposed the appellant's removal for unacceptable performance pursuant to 5 U.S.C. chapter 43 and for working outside of normal work hours without authorization. RFR File, Tab 5 at 332-35. On June 3, 2022, the agency issued a decision removing the appellant effective that day. RFR File, Tab 1 at 2, Tab 5 at 340-43.

¶8 The appellant's union grieved the removal, and, after an arbitration hearing, the arbitrator issued an opinion and award sustaining the appellant's removal for unacceptable performance. RFR File, Tab 1 at 522. She concluded that although Technical Skills was one of five core competencies of the appellant's overall critical performance area, it was essentially a critical element of her position. *Id*.

at 514. In so finding, she credited the testimony of the deciding official that unacceptable performance in one competency could result in an overall unacceptable performance rating. *Id.* She further found that the appellant's goals were not too vague; the appellant was provided with a meaningful opportunity to demonstrate acceptable performance; the appellant's supervisor warned the appellant upon completion of the EPP that failure to maintain acceptable performance could result in removal; and, after completion of the EPP, the appellant's performance once again became unacceptable. *Id.* at 515-20. She also found that the appellant did not dispute that she worked outside of normal work hours without authorization, despite being warned not to do so. *Id.* at 515. The arbitrator determined that the appellant failed to prove her affirmative defense of reprisal for her Rehabilitation Act-protected activities of requesting reasonable accommodations and filing EEO complaints opposing disability discrimination. *Id.* at 520-22.

¶9 The appellant has requested review of the arbitrator's opinion and award. RFR File, Tab 1. The agency has responded in opposition to the appellant's request. RFR File, Tab 5.

## DISCUSSION OF ARGUMENTS ON REVIEW

The Board has jurisdiction to consider the appellant's request for review.

¶10 The Board has jurisdiction to review an arbitrator's decision under 5 U.S.C. § 7121(d) when the following conditions are met: (1) the subject matter of the grievance is one over which the Board has jurisdiction; (2) the appellant either (i) raised a claim of discrimination under 5 U.S.C. § 2302(b)(1) with the arbitrator in connection with the underlying action or (ii) raises a claim of discrimination in connection with the underlying action under 5 U.S.C. § 2302(b)(1) for the first time with the Board if such allegations could not be raised in the negotiated grievance procedure; and (3) a final arbitration decision has been issued. *Scanlin*

*v. Social Security Administration*, 2022 MSPB 10, ¶ 4; 5 C.F.R. § 1201.155(a)(1), (c).

¶11 Here, we find that all of these conditions have been met. First, it is undisputed that the appellant's grievance concerned her removal for unacceptable performance under 5 U.S.C. chapter 43, a subject matter over which the Board has jurisdiction. *See* 5 U.S.C. § 4303(e); *Galloway v. Social Security Administration*, 111 M.S.P.R. 78, ¶ 11 (2009). Second, the appellant alleged before the arbitrator that the agency's action was reprisal for the Rehabilitation Act-protected activities of requesting reasonable accommodation and filing EEO complaints. *E.g.*, RFR File, Tab 1 at 478-94, 513. Finally, the arbitrator has issued a final decision. *Id*. at 500-23. Consequently, we find that the Board has jurisdiction to review the arbitration decision.

The standard of review for an arbitration decision is limited.

¶12 The standard of the Board's review of an arbitrator's award is limited; indeed, such awards are entitled to a greater degree of deference than initial decisions issued by the Board's administrative judges. *Sadiq v. Department of Veterans Affairs*, 119 M.S.P.R. 450, ¶ 5 (2013). The Board will modify or set aside such an award only when the arbitrator has erred as a matter of law in interpreting a civil service law, rule, or regulation. *Id*. Even if the Board disagrees with an arbitrator's decision, absent legal error, the Board cannot substitute its conclusions for those of the arbitrator. *Id*. Thus, the arbitrator's factual determinations are entitled to deference unless the arbitrator erred in his legal analysis, for example, by misallocating the burdens of proof or employing the wrong analytical framework. *Id*. Nevertheless, the Board can defer to the arbitrator's findings and conclusions only if the arbitrator makes specific findings on the issues in question. *Id*. Further, the Board may make its own findings when the arbitrator failed to cite any legal standard or employ any analytical framework for his evaluation of the evidence. *Id*.

¶13     On review, the appellant argues that the Board need not defer to the arbitrator's findings because she did not cite any legal standard or set forth the correct analytical framework for chapter 43 performance-based actions or her affirmative defense of EEO reprisal. RFR File, Tab 1 at 27, 30-32. We agree that the arbitrator did not cite these legal standards or fully and adequately apply either analytical framework. Therefore, as explained below, we make our own findings as to whether the agency proved its charge of unacceptable performance and forward the appellant's affirmative defense of reprisal to the regional office for further adjudication consistent with this order. *See Hollingsworth v. Department of Commerce*, 115 M.S.P.R. 636, ¶ 8 (2011) (reasoning that an arbitrator's failure to fully analyze a material issue constitutes legal error, which permits the Board to make its own findings).

<u>We reverse the arbitrator's conclusion that the agency proved its charge of unacceptable performance and cancel the appellant's removal.</u>

¶14     To defend an action under chapter 43, the agency must prove the following by substantial evidence:[2]  (1) OPM approved its performance appraisal system and any significant changes thereto; (2) the agency communicated to the appellant the performance standards and critical elements of her position; (3) the appellant's performance standards are valid under 5 U.S.C. § 4302(c)(1); (4) the appellant's performance during the appraisal period was unacceptable in one or more critical elements; (5) the agency warned the appellant of the inadequacies in her performance during the appraisal period and gave her an adequate opportunity to demonstrate acceptable performance; and (6) after an adequate improvement period, the appellant's performance remained unacceptable in at least one critical element. *Lee v. Department of Veterans Affairs*, 2022 MSPB 11, ¶ 15.

¶15     On review, the appellant argues that the agency did not clearly communicate to her what was necessary to achieve a satisfactory rating and therefore she was

---

[2] Substantial evidence is the degree of relevant evidence that a reasonable person, considering the record as a whole, might accept as adequate to support a conclusion, even though other reasonable persons might disagree. 5 C.F.R. § 1201.4(p).

not given a meaningful opportunity to improve her performance. RFR File, Tab 1 at 31-41. Specifically, she contends that, although the agency provided written requirements in the EPP letter of what the appellant needed to do to achieve a satisfactory level of performance, H.M. also told her verbally and in writing that those deadlines could be adjusted if necessary. *Id*. at 33. Indeed, H.M. testified that, despite the appellant continuing to miss deadlines during the EPP period, she gave her "the benefit of the doubt" and determined that the appellant successfully completed the EPP period. *Id*. at 297-300, 329-31 (testimony of H.M.). The appellant argues that as a result, she "left the EPP period with the understanding that she could miss deadlines and work outside of her normal hours on occasion and still perform acceptably," and she was not provided "a baseline" of how many deadlines she could miss and still maintain acceptable performance. *Id*. at 34.

¶16    The appellant argues that after the EPP period, her supervisor changed the standard for acceptable performance by no longer allowing the appellant to adjust her deadlines and did not clearly communicate that new expectation to her. *Id*. at 34. The arbitrator summarily concluded, without applying any legal standard, that there was no merit to the appellant's arguments that her performance standards were too vague and that she was therefore not given a meaningful opportunity to improve. *Id*. at 515-18. The arbitrator reasoned that "the absence of a specific directive that an environmental protection specialist must comply with work production deadlines and work only during normal work hours does not render [the Technical Skills standard] too vague to guide the [appellant's] job performance." *Id*. at 516. She also was not persuaded that the appellant's post-EPP standards were changed, finding merely that "the [a]gency changed its willingness to overlook [the appellant's] unacceptable level of performance." *Id*. at 517. Because the arbitrator failed to fully and adequately determine the crux of the issue in this appeal, which is whether the original EPP period provided the appellant an adequate opportunity to improve, we make our own findings on this issue. *See Sadiq*, 119 M.S.P.R. 450, ¶ 5.

¶17    In some instances, such as here, an employee is able to perform at an acceptable level while on an improvement plan, but her performance subsequently deteriorates and again becomes unacceptable. *Lin v. Department of the Air Force*, 2023 MSPB 2, ¶ 22. Such an individual is known as a "roller coaster" employee. *Id*. An agency that has implemented a PIP generally is not required to give a roller coaster employee a new PIP prior to removing him, provided it takes its action based on instances of unacceptable performance in the same critical elements for which the PIP was imposed that occurred within 1 year from the inception of the PIP. *Id*. (citing *Sullivan v. Department of the Navy*, 44 M.S.P.R. 646, 659 (1990), *overruled on other grounds*, *as recognized in Thomas v. Department of Defense*, 117 F. App'x 722, 724-25 (Fed. Cir. 2004)). In such instances, the agency must prove that the original PIP constituted a reasonable opportunity to demonstrate acceptable performance. *Sullivan*, 44 M.S.P.R. at 659-60. If it does not, the action cannot stand. *Id*. at 660.

¶18    Here, we agree with the appellant that the agency did not clearly communicate to her what was necessary to achieve a satisfactory rating and therefore she was not given a meaningful opportunity to improve her performance. To assure that an employee receives a bona fide opportunity to improve, an agency must prove both that it communicated the standards against which an employee's performance would be measured and that it gave the employee adequate instructions regarding the manner in which she was expected to perform the duties of her position prior to holding her accountable for performance deficiencies. *Jones v. National Gallery of Art*, 36 M.S.P.R. 602, 604, *aff'd per curiam*, 864 F.2d 148 (Fed. Cir. 1988).

¶19    Performance standards should be specific enough to provide an employee with a firm benchmark toward which to aim her performance and must be sufficiently precise so as to invoke general consensus as to their meaning and content. *Towne v. Department of the Air Force*, 120 M.S.P.R. 239, ¶ 21 (2013), *modified on other grounds by Lee*, 2022 MSPB 11. Here, the agency submitted

the appellant's 2021 performance standards, which show that she was subject to a two-tier successful/unacceptable overall rating system. RFR File, Tab 5 at 345-46. However, those performance standards are, without more, invalid because they only define successful performance in general terms. For example, the Technical Skills core competency at issue in the appellant's EPP and removal merely states that the expectation is "met" if the employee is "[p]roficient in the technical skills necessary to accomplish their assigned work in an effective and efficient manner. Examples would include use of job-specific equipment, automated systems/databases, research materials, enforcement techniques, manuals, etc."[3] *Id*. at 345.

¶20    Nevertheless, an agency may cure otherwise fatal defects in the development and communication of performance standards by communicating sufficient information regarding performance requirements at the beginning of, and even during, the PIP. *Thompson v. Department of the Navy*, 89 M.S.P.R. 188, ¶ 18 (2001). It also may modify, at the beginning of the employee's PIP, the quality and quantity of performance required, as long as it does so according to a reasonable standard and makes the appellant aware of the modifications. *Id*.

¶21    Here, the EPP notice augmented the appellant's performance standard for the Technical Skills competency by providing that the appellant was required to produce two fact sheets per pay period, outlining the information that was required to be included in the fact sheets, and setting specific deadlines for their submission. RFR File, Tab 5 at 325-26. Specifically, the notice provided that the

---

[3] As mentioned above, the arbitrator essentially found that the Technical Skills core competency is a critical element of the appellant's performance plan by crediting the testimony of the deciding official in the appellant's removal that unacceptable performance in one competency level may result in overall unacceptable performance in the position, as was the case here. RFR File, Tab 1 at 514, 78-79 (testimony of the deciding official). On review, the appellant does not specifically challenge that finding, and therefore, we do not disturb it. 5 C.F.R. § 432.103(b) (defining a critical element as "a work assignment or responsibility of such importance that unacceptable performance on the element would result in a determination that an employee's overall performance is unacceptable").

draft fact sheets were due to H.M. for approval and any necessary edits by 4:00 p.m. PST on the second Monday of each pay period, and the final fact sheets had to be uploaded into "TRIRIGA" by 4:00 p.m. PST on the second Thursday of each pay period. *Id*. at 326. However, it is undisputed that H.M. told the appellant that those deadlines could be adjusted if necessary. RFR File, Tab 1 at 33. H.M. testified that, during the EPP period, she was willing to adjust the appellant's deadlines if the appellant was taking leave or needed additional time, including on a couple occasions when the appellant requested extensions the day of the deadline. *Id.* at 297-98, 326 (testimony of H.M.). H.M. also testified that, during the EPP period, the appellant missed deadlines and submitted drafts past normal working hours, but she nevertheless determined that the appellant successfully completed the EPP period. *Id*. at 298-301, 516-17 (testimony of H.M.).

¶22     The fact that the performance standard may call for a certain amount of subjective judgment on the part of the employee's supervisor does not automatically invalidate it. *Henderson v. National Aeronautics and Space Administration*, 116 M.S.P.R. 96, ¶ 23 (2011). However, as noted above, the performance standards must be sufficiently precise and specific as to invoke a general consensus as to its meaning and content and provide a firm benchmark toward which the employee may aim her performance. *Id*. Here, we find that the appellant was not provided with a firm benchmark toward which to aim her performance. For instance, in her testimony, H.M. did not specify the number of missed deadlines during the EPP period that she deemed few enough to still warrant successful performance on the EPP and, ultimately, the appellant's 2021 overall annual performance rating, although she did testify that it was not as many as the 11 missed deadlines cited in the proposed removal. RFR File, Tab 1 at 330 (testimony of H.M.). Moreover, H.M. did not testify, nor did the agency otherwise establish, that the appellant was ever informed of the number of late assignments that would have differentiated between minimally successful and

unacceptable performance in the Technical Skills competency. Based on the aforementioned, we find that the agency has not shown by substantial evidence that it cured its invalid performance standard during the EPP period. Consequently, it has not shown that the EPP constituted a reasonable opportunity to demonstrate acceptable performance, and the appellant's removal cannot stand. *Sullivan*, 44 M.S.P.R. at 660.

¶23     Accordingly, we reverse the arbitrator's conclusion that the agency proved its charge of unacceptable performance. The agency's failure to show that its performance standards were valid is also relevant to the other elements in the agency's case, including for example the substantive element set forth in *Santos v. National Aeronautics and Space Administration*, i.e., that the employee's performance was unacceptable prior to the PIP. 990 F.3d 1355, 1361-62 (Fed. Cir. 2021). Absent valid performance standards, the Board cannot evaluate whether the appellant's performance was unacceptable. *See, e.g.*, *Henderson*, 116 M.S.P.R. 96, ¶ 9; *Ortiz v. Department of Justice*, 46 M.S.P.R. 692, 695 (1991); *Williams v. Department of Health and Human Services*, 30 M.S.P.R. 217, 220 (1986). Because we reverse the removal on other grounds, we need not reach the remaining elements of the agency's case.

<u>We vacate the arbitrator's finding that the appellant did not prove her claim of EEO reprisal under the Rehabilitation Act and forward the matter to the regional office for adjudication of that claim.</u>

¶24     As the appellant correctly argues, and as discussed further below, the arbitrator failed to apply any legal standard or analytical framework and to consider all the relevant evidence before her in finding that the appellant did not prove her affirmative defense of reprisal for requesting reasonable accommodations and filing EEO complaints opposing disability discrimination. RFR File, Tab 1 at 30-31, 520-22. Accordingly, we need not defer to her finding that the appellant did not prove her affirmative defense. *See Sadiq*, 119 M.S.P.R. 450, ¶ 5; *see also Pace v. Department of the Treasury*, 118 M.S.P.R. 542, ¶ 9

(2012) (declining to defer to the arbitrator's decision regarding the appellant's discrimination claims when the arbitrator failed to analyze the claims under any recognizable legal standard or framework).

¶25    In *Pridgen v. Office of Management and Budget*, 2022 MSPB 31, ¶¶ 44-47, the Board clarified the proper analytical framework to be applied to an affirmative defense of retaliation for engaging in the Rehabilitation Act-protected activities of requesting reasonable accommodations and filing EEO complaints opposing disability discrimination.  Specifically, the Board explained in *Pridgen* that an appellant must prove that the agency would not have removed her "but for" her protected activity.  *Pridgen*, 2022 MSPB 31, ¶¶ 44-47.  Under a but-for causation standard, an agency "cannot avoid liability just by citing some other factor that contributed to its challenged employment decision."  *Bostock v. Clayton County*, 590 U.S. 644, 656 (2020).  An employer is liable if the prohibited consideration "was one but-for cause of [its] decision."  *Id*.

¶26    On review, the appellant argues that the arbitrator erred as a matter of law by failing to properly consider all the relevant evidence of retaliation in finding that the appellant's March 3, 2021 performance counseling memorandum, her placement on an EPP on July 15, 2021, and her removal on June 3, 2022, were not retaliatory.  RFR File, Tab 1 at 42-49.  In denying the appellant's reprisal affirmative defense, the arbitrator essentially found that the timing of the appellant's counseling memorandum, EPP, and removal was not suspicious, reasoning that the instances of alleged poor performance that formed the basis of the appellant's counseling and the subsequent EPP occurred before the appellant's protected activity.  *Id*. at 520-21.  The arbitrator also cited other evidence undermining a retaliatory motive, such as H.M. lowering the appellant's performance goals from four to two fact sheets per pay period; conducting weekly progress reports during the EPP period documenting the appellant's progress, or lack thereof; making the communication changes to SharePoint that the appellant requested; and, most importantly, determining that the appellant had successfully

completed the EEP "despite imperfect performance." *Id*. at 521. For the following reasons, we agree with the appellant that the arbitrator erred as a matter of law in not applying the correct legal analysis, failing to fully consider the relevant evidence before her, and not making credibility findings in the first instance.

¶27 On review, the appellant argues that the mere fact that the appellant's alleged performance issues, which H.M. began to document in November 2020, predated the March 3, 2021 performance counseling memorandum and the July 15, 2021 EPP notice does not preclude a finding that H.M. issued the appellant the counseling and placed her on an EPP in retaliation for her protected activity. *Id*. at 44-46. She also argues that the arbitrator did not consider H.M.'s February 11 and December 8, 2021 emails, wherein H.M. responded to the appellant's reasonable accommodation requests with retaliatory animus. *Id*. at 45-48. We agree that the arbitrator erred in not addressing or considering these emails in determining whether the appellant proved her reprisal affirmative defense. *Id*. at 520-21.

¶28 First, according to the appellant's EEO counselor's report, the appellant began requesting clear face masks for her hearing impairment in September 2020; thus, the arbitrator erred in determining that her alleged performance issues predated her EEO activity. RFR File, Tab 1 at 521, Tab 2 at 2-3. In any event, according to H.M.'s February 11, 2021 email to the appellant, H.M. did not learn of the appellant's accommodation request until the previous day when she was copied on the emails by her senior management. RFR File, Tab 2 at 9-12. She responded by admonishing the appellant for her "highly unprofessional" communication, ordering her to "stand down," and advising her to submit any further requests to her first. *Id*. at 9-12. The appellant reargues on review that this email demonstrates that H.M. did not like when the appellant exercised her EEO rights and is why, less than a month later, H.M. issued the appellant the counseling memorandum. RFR File, Tab 1 at 46, 479; Tab 5 at 319-322. During

the hearing, H.M. testified that those were "two totally separate issues." RFR File, Tab 1 at 304-06 (testimony of H.M.).

¶29 According to the EEO counselor's report, H.M. was interviewed on June 14, 2021, concerning her February 11, 2021 response to the appellant's accommodation request for clear face masks and her partial denial of the appellant's request for official time to attend an EEO mediation. RFR File, Tab 2 at 2, 6-7. Then, a month later on July 15, 2021, H.M. placed the appellant on an EPP, which the appellant reargues was in reprisal for her disability EEO complaint and accommodation request. RFR File, Tab 1 at 45, 450-51, 487; Tab 5 at 324-27. However, during the hearing, H.M. testified that she did not know what the appellant's complaint was about and denied that she placed the appellant on an EPP in retaliation for her EEO mediation. RFR File, Tab 1 at 309, 332 (testimony of H.M.). H.M. also testified that it was the team lead who recommended reducing the number of fact sheets from four to two per pay period to make the appellant's work more achievable during the EPP period, and that the team lead and the appellant agreed on that change. *Id*. at 265 (same). Thus, the arbitrator erred in crediting H.M. for that decision and finding that it refuted any alleged retaliatory animus H.M. harbored. *Id*. at 521. The arbitrator summarily decided that there was "no credible evidence" of reprisal without addressing the aforementioned conflicting evidence or making any credibility findings in the first instance with respect to whether the appellant's disability EEO complaint and accommodation request were a but-for cause in H.M.'s decision to issue the appellant a counseling memorandum and place her on an EPP for not timely submitting fact sheets. *Id*.

¶30 Similarly, we agree with the appellant that the arbitrator improperly failed to consider H.M.'s December 8, 2021 email to the agency's Labor Relations representative, in which she forwarded the appellant's complaint that the agency mishandled her accommodation request for her contact information be changed in SharePoint. *Id*. at 46-48, 521. The appellant reargues that the email demonstrates

H.M.'s animus against the appellant for making disability complaints and accommodation requests and caused H.M. to begin working with Labor Relations compiling instances of the appellant's alleged unprofessional behavior and unacceptable performance for her removal. *Id*. at 46-48, 488-94.

¶31    As established earlier, during the EPP period between July 15 and November 18, 2021, H.M. was flexible and willing to adjust the appellant's deadlines for submitting drafts of fact sheets when the appellant needed more time, and, despite the appellant's submitting fact sheets past the deadlines and working after hours, she determined that the appellant successfully completed the EPP. *Id*. at 297-98, 326, 516-17 (testimony of H.M.). On November 4, 2021, H.M. also gave the appellant a successful overall annual performance rating. RFR File, Tab 5 at 346. Then, on December 8, 2021, less than a month after determining that the appellant's performance was acceptable, H.M. was again copied on emails with management concerning the appellant's accommodation request to change her method of contact in SharePoint based on her hearing impairment. RFR File, Tab 1 at 383-85. In response, H.M. emailed the appellant admonishing her for not coming directly to her first to "avoid unnecessary conflict" and citing the appellant's emails concerning this accommodation request as "an example of miscommunication." *Id*. at 384-85. When the appellant clarified that she submitted her SharePoint request to the team lead because she was the point of contact listed on the SharePoint site, H.M. emailed Labor Relations requesting advice on how to respond to the appellant who "sees the need to respond the way she did and include the majority of [H.M.'s] PMO leadership for no clear reason." *Id*. at 383. H.M. also stated that she was "at [her] limits" with the appellant's "irrational accusations" and felt "under attack." *Id*. She stated that she felt their "professional relationship and level of respect for each other" had improved during the appellant's EPP period, but "the below is evidence that [she was] incorrect in [her] beliefs and [she had] run out of ideas on how to effectively manage this employee's behavior." *Id*.

¶32      For several weeks thereafter, H.M. emailed with Labor Relations providing examples of the appellant's alleged unprofessional behavior and unacceptable performance for the proposed removal.  *Id*. at 376-82.  Among them was a December 27, 2021 email from the appellant to H.M. raising concerns she had with meeting the deadlines for the submission of fact sheets due on December 29, 2021, and January 7, 2022, because of her holiday leave, mandatory training, computer issues she was experiencing, and a medical procedure she was having and because H.M. had scheduled the deadlines closer together.  *Id*. at 376-77.  In a January 4, 2022 email to Labor Relations, H.M. referred to the appellant's concerns as "a series of excuses" that did not justify missing the established deadlines.  *Id*.  Then, on March 15, 2022, the agency proposed the appellant's removal for submitting drafts of fact sheets late on 11 occasions, from December 2021 to February 2022, including on December 29, 2021, and January 7, 2022.  RFR File, Tab 5 at 332-35.  The agency removed her on June 3, 2022.  RFR File, Tab 1 at 2, Tab 5 at 340-43.

¶33      During the hearing, when H.M. was questioned about the December 8, 2021 email, she testified that she thought the appellant was being irrational because the claims the appellant made "didn't seem to have a basis" and came "out of nowhere."  RFR File, Tab 1 at 333 (testimony of H.M.).  She also testified that she did not adjust the appellant's deadlines in December 2021 because, although the appellant spoke to her and mentioned potentially taking leave, the appellant had not requested the leave in advance.  *Id*. at 261 (same).  She testified that she thought the appellant was providing a "series of excuses" because the appellant was only providing this information to her after a deadline was missed and was being held accountable.  *Id*. at 319-20 (same).  Lastly, she testified that she was involved in providing information about the appellant's performance for the removal.  *Id*. at 314 (same).

¶34      The arbitrator did not consider the aforementioned evidence or make any credibility findings in the first instance as to whether the appellant's EEO

complaints and accommodation requests were a but-for cause in H.M.'s decision to initiate the proposed removal. Instead, the arbitrator only considered the December 8, 2021 email between H.M. and the appellant, wherein H.M. informed the appellant that she had changed the appellant's contact method in SharePoint, and found that, although H.M. was "critical" of the way the appellant handled the request, the fact that H.M. made the appellant's requested change in 1 day undercut any claim that she harbored retaliatory motive against the appellant. *Id*. at 521. The arbitrator also did not make any findings as to whether H.M. improperly influenced the proposing and deciding official in the appellant's removal under the cat's paw theory. Under the cat's paw theory, an appellant can show retaliation by showing that a particular management official, acting because of an improper animus, influenced an agency official who is unaware of the improper animus when implementing a personnel action. *See Aquino v. Department of Homeland Security*, 121 M.S.P.R. 35, ¶ 19 (2014). This is especially concerning considering that H.M. was willing to adjust the appellant's deadlines and accept untimely drafts without consequence during the EPP period but was no longer willing to do so after the appellant's December 8, 2021 protected activity.

¶35 Therefore, we vacate the arbitration decision as to the findings of no retaliation. Pursuant to the Board's authority in 5 C.F.R. § 1201.155(e), we forward the matter to the Board's Western Regional Office for assignment to an administrative judge to make recommended findings on the appellant's retaliation claims under the appropriate legal standards. *See Brookens v. Department of Labor*, 120 M.S.P.R. 678, ¶ 15 (2014) (forwarding the appellant's claims of discrimination to the regional office for further adjudication because the arbitrator did not set forth any analytical framework for his determinations).

¶36 An appellant is typically entitled to notice of the applicable burdens and elements of proof and an opportunity to submit evidence and argument under the proper standard. *Brookens*, 120 M.S.P.R. 678, ¶ 16. To the extent that, during

the arbitration process, the appellant was not afforded proper notice of her burdens and elements of proof regarding her affirmative defense, the administrative judge shall provide such notice and afford the parties the opportunity to submit evidence and argument under the proper standards, including holding a supplemental hearing on the limited issue of the appellant's affirmative defense of reprisal, before making recommended findings on the merits of those claims. *Id.*[4]

## ORDER

¶37    For the reasons set forth above, we forward this matter to the Western Regional Office for further adjudication of the appellant's affirmative defenses of reprisal for the Rehabilitation Act-protected activities of requesting reasonable accommodations and filing EEO complaints. The administrative judge assigned to the matter shall conduct further proceedings as necessary, consistent with this Order. After the administrative judge issues the recommended decision, the case will be forwarded back to the Board. The parties may file exceptions to the administrative judge's recommended decision with the Clerk of the Board within 20 days of the date of the recommended decision. The parties may respond to any submission by the other party within 15 days of the date of such submission. The Board will subsequently issue a final decision in this matter.

¶38    Notwithstanding the additional proceedings on the appellant's discrimination and retaliation claims, we ORDER the agency to cancel the removal and reinstate the appellant to her position of GS-13, Environmental Protection Specialist, effective June 3, 2022. *See Kerr v. National Endowment for the Arts*, 726 F.2d 730 (Fed. Cir. 1984). The agency must complete this action no later than 20 days after the date of this decision.

---

[4] The Board's regulations provide that a request for attorney fees must be made within 60 days after issuance of a final decision, 5 C.F.R. § 1201.203(d). In this case, the time limit for filing such a request will not begin to run until the Board issues a final decision in this matter. *See Aldridge v. Department of Agriculture*, 111 M.S.P.R. 670, ¶ 23 n.4 (2009).

¶39     We also ORDER the agency to pay the appellant the correct amount of back pay, interest on back pay, and other benefits under the Office of Personnel Management's regulations, no later than 60 calendar days after the date of this decision.  We ORDER the appellant to cooperate in good faith in the agency's efforts to calculate the amount of back pay, interest, and benefits due, and to provide all necessary information the agency requests to help it carry out the Board's Order.  If there is a dispute about the amount of back pay, interest due, and/or other benefits, we ORDER the agency to pay the appellant the undisputed amount no later than 60 calendar days after the date of this decision.

¶40     We further ORDER the agency to tell the appellant promptly in writing when it believes it has fully carried out the Board's Order and of the actions it has taken to carry out the Board's Order.  The appellant, if not notified, should ask the agency about its progress.  *See* 5 C.F.R. § 1201.181(b).

¶41     No later than 30 days after the agency tells the appellant that it has fully carried out the Board's Order, the appellant may file a petition for enforcement with the Clerk of the Board if the appellant believes that the agency did not fully carry out the Board's Order.  The petition should contain specific reasons why the appellant believes that the agency has not fully carried out the Board's Order, and should include the dates and results of any communications with the agency. 5 C.F.R. § 1201.182(a).

¶42       For agencies whose payroll is administered by either the National Finance Center of the Department of Agriculture (NFC) or the Defense Finance and Accounting Service (DFAS), two lists of the information and documentation necessary to process payments and adjustments resulting from a Board decision are attached. The agency is ORDERED to timely provide DFAS or NFC with all documentation necessary to process payments and adjustments resulting from the Board's decision in accordance with the attached lists so that payment can be made within the 60-day period set forth above.

FOR THE BOARD:      _____

*Gina K. Grippando*

Gina K. Grippando
Clerk of the Board

Washington, D.C.

## DEFENSE FINANCE AND ACCOUNTING SERVICE
### Civilian Pay Operations

# DFAS BACK PAY CHECKLIST

The following documentation is required by DFAS Civilian Pay to compute and pay back pay pursuant to 5 CFR § 550.805.  Human resources/local payroll offices should use the following checklist to ensure a request for payment of back pay is complete.  Missing documentation may substantially delay the processing of a back pay award.  **More information may be found at: https://wss.apan.org/public/DFASPayroll/Back%20Pay%20Process/Forms/AllItems.aspx.**

**NOTE:  Attorneys' fees or other non-wage payments (such as damages) are paid by vendor pay, not DFAS Civilian Pay.**

☐   1) Submit a **"SETTLEMENT INQUIRY - Submission"** Remedy Ticket.  Please identify the specific dates of the back pay period within the ticket comments.

Attach the following documentation to the Remedy Ticket, or provide a statement in the ticket comments as to why the documentation is not applicable:

☐   2) Settlement agreement, administrative determination, arbitrator award, or order.

☐   3) Signed and completed "Employee Statement Relative to Back Pay".

☐   4) All required SF50s (new, corrected, or canceled).  **\*\*\*Do not process online SF50s until notified to do so by DFAS Civilian Pay.\*\*\***

☐   5) Certified timecards/corrected timecards.  **\*\*\*Do not process online timecards until notified to do so by DFAS Civilian Pay.\*\*\***

☐   6) All relevant benefit election forms (e.g., TSP, FEHB, etc.).

☐   7) Outside earnings documentation.  Include record of all amounts earned by the employee in a job undertaken during the back pay period to replace federal employment.  Documentation includes W-2 or 1099 statements, payroll documents/records, etc.  Also, include record of any unemployment earning statements, workers' compensation, CSRS/FERS retirement annuity payments, refunds of CSRS/FERS employee premiums, or severance pay received by the employee upon separation.

**Lump Sum Leave Payment Debts:**  When a separation is later reversed, there is no authority under 5 U.S.C. § 5551 for the reinstated employee to keep the lump sum annual leave payment they may have received.  The payroll office must collect the debt from the back pay award.  The annual leave will be restored to the employee.  Annual leave that exceeds the annual leave ceiling will be restored to a separate leave account pursuant to 5 CFR § 550.805(g).

**NATIONAL FINANCE CENTER CHECKLIST FOR BACK PAY CASES**

Below is the information/documentation required by National Finance Center to process payments/adjustments agreed on in Back Pay Cases (settlements, restorations) or as ordered by the Merit Systems Protection Board, EEOC, and courts**.**

1.  Initiate and submit AD-343 (Payroll/Action Request) with clear and concise information describing what to do in accordance with decision.

2.  The following information must be included on AD-343 for Restoration:

    a.  Employee name and social security number.
    b.  Detailed explanation of request.
    c.  Valid agency accounting.
    d.  Authorized signature (Table 63).
    e.  If interest is to be included.
    f.  Check mailing address.
    g.  Indicate if case is prior to conversion. Computations must be attached.
    h.  Indicate the amount of Severance and Lump Sum Annual Leave Payment to be collected (if applicable).

Attachments to AD-343

1.  Provide pay entitlement to include Overtime, Night Differential, Shift Premium, Sunday Premium, etc. with number of hours and dates for each entitlement (if applicable).
2.  Copies of SF-50s (Personnel Actions) or list of salary adjustments/changes and amounts.
3.  Outside earnings documentation statement from agency.
4.  If employee received retirement annuity or unemployment, provide amount and address to return monies.
5.  Provide forms for FEGLI, FEHBA, or TSP deductions (if applicable).
6.  If employee was unable to work during any or part of the period involved, certification of the type of leave to be charged and number of hours.
7.  If employee retires at end of Restoration Period, provide hours of Lump Sum Annual Leave to be paid.

NOTE: If prior to conversion, agency must attach Computation Worksheet by Pay Period and required data in 1-7 above.

The following information must be included on AD-343 for Settlement Cases: (Lump Sum Payment, Correction to Promotion, Wage Grade Increase, FLSA, etc.)

    a.  Must provide same data as in 2, a-g above.
    b.  Prior to conversion computation must be provided.
    c.  Lump Sum amount of Settlement, and if taxable or non-taxable.

If you have any questions or require clarification on the above, please contact NFC's Payroll/Personnel Operations at 504-255-4630.